SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
mccoy@seyfarth.com
Clara L. Rademacher (SBN 355494)
crademacher@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:   (415) 397-8549

Attorneys for Defendant
RELX INC. and LEXIS-NEXIS RISK
SOLUTIONS FL INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS MCARTHUR, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RELX INC., a Delaware Corporation, LEXIS-NEXIS RISK SOLUTIONS FL INC., a Minnesota Corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:25-cv-06120-SK<br><br>**DEFENDANTS RELX INC. AND LEXIS-NEXIS RISK SOLUTIONS FL INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      July 29, 2026<br>Time:      10:00 a.m.<br>Location:  Courtroom 540, 5th Floor<br>           Edward R. Roybal Federal<br>           Building<br>Judge:     Hon. Steve Kim<br><br>Complaint Filed:          6/3/25<br>Removed to Federal Court:  7/7/25 |

RELX INC. AND LEXIS-NEXIS RISK SOLUTIONS FL INC.'s NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT; MPA I/S/O

317537854

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................1

II.   FACTS NOT SUBJECT TO REASONABLE DISPUTE ..........................3

    A.   The Parties ........................................................................................3

    B.   Plaintiff Receives a Duplicative Retention Bonus, Which He Never Repaid ................................................................................................3

    C.   Plaintiffs Is Assigned a New Role ....................................................4

    D.   Plaintiff's Performance Issues and Lack of Engagement .................4

III.  LEGAL STANDARD ...................................................................................11

IV.   ARGUMENT .................................................................................................11

    A.   Plaintiff's Purported CFRA Retaliation Claim Fails (First Cause of Action) .............................................................................................11

        1.   Plaintiff Cannot Establish Causation ....................................11

        2.   LNRS Was Also Entitled to Terminate Plaintiff's Employment for His Breach of the Repayment Agreement ...................................13

    B.   Plaintiff's Duplicative Claim for Termination in Violation of Public Policy Also Fails .............................................................................14

    C.   LNRS Is Entitled to Summary Judgment on its Counterclaim for Breach of the Repayment Agreement ..............................................14

V.    CONCLUSION ..............................................................................................14

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................11

*Delgado v. United Facilities, Inc.*,
    No. 2:11-cv-485 2012 U.S. Dist. LEXIS 21527 (E.D. Cal. Feb. 7, 2012).........11

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) .............................................................11

**State Cases**

*Chen v. City of Orange*,
    96 Cal. App. 4th 926 (2002)...........................................................12, 13

*Dudley v. Dept. of Transportation*
    90 Cal.App.4th 255 (2001) ...............................................................11

*Muller v. Automobile Club of So. California*,
    61 Cal.App.4th 431 (1998) ...............................................................14

*Turner v. Anheuser-Busch, Inc.*,
    7 Cal. 4th 1238 (1994) ......................................................................14

**State Statutes**

California Family Rights Act............................................................*passim*

**Rules**

Fed. R. Civ. P. 56.......................................................................................1

Fed. R. Civ. P. 56(a)................................................................................11

L.R. 7-3 ....................................................................................................1

L. R. 11-6-1 .............................................................................................16

ii

L.R. 11-6.2 ..................................................................................................16

## <u>NOTICE OF MOTION AND MOTION</u>

**PLEASE TAKE NOTICE** that on July 29, 2026, 2026, at 10:00 a.m., or as soon thereafter as counsel can be heard in the above-entitled Court, in Courtroom 540, 5th Floor, Defendants RELX INC. ("RELX") and LEXIS-NEXIS RISK SOLUTIONS FL INC. ("LNRS") (collectively, "Defendants") will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on (1) all Causes of Action asserted against them by Plaintiff NICHOLAS MCARTHUR ("Plaintiff") in his Second Amended Complaint for Damages ("SAC") and (2) on LNRS's counterclaim for breach of contract.

Defendants respectfully request the Court grant summary judgment on Plaintiff's First Cause of Action for retaliation in violation of the California Family Rights Act [Government Code Section 12945.2, Subdivision (k)] ("CFRA") because (a) the undisputed material facts show that Plaintiff was terminated based on his failure to correct performance deficiencies that arose (and were communicated to him) before Plaintiff first informed LNRS of any intent to take protected CFRA leave and, therefore, he cannot demonstrate causation as required to establish a prima facie case of retaliation in violation of CFRA, and (b) because LNRS had grounds to terminate Plaintiff's employment for his admitted breach of the Repayment of Duplicative Retention Bonus Agreement ("Repayment Agreement"). Defendants also request the Court grant summary judgment in their favor on Plaintiff's Second Cause of Action for wrongful termination in violation of public policy because that claim is duplicative of Plaintiff's First Cause of Action and accordingly fails for the same reason.

Finally, LNRS further respectfully requests the Court grant it summary judgment on its counterclaim for breach of the Repayment Agreement based on Plaintiff's admission that he breached the Repayment Agreement.

This motion is made following a conference of counsel pursuant to L.R. 7-3, which took place on June 15, 2026. *See* Declaration of Ryan McCoy ("McCoy Decl."), ¶ 6.

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Based on Plaintiff's own deposition testimony and the undisputed documentary record, Defendants are entitled to summary judgment on Plaintiff's purported claim for retaliation under the California Family Rights Act ("CFRA"), his duplicative claim for wrongful termination in violation of public policy, and LNRS's counterclaim for breach of contract.

Plaintiff was an at-will employee of LNRS, whose behavioral issues, lack of engagement, and overall poor performance resulted in the termination of his employment in July 2024. The undisputed facts show, well *before* Plaintiff requested a leave of absence to care for his sister on March 7, 2024, management had identified significant concerns regarding Plaintiff's performance, engagement, and workplace conduct. Plaintiff received considerable coaching and one-on-one support, as well as deep performance feedback, but he repeatedly failed to improve. Worse, Plaintiff's dismissive attitude toward his manager and his refusal to engage with his coworkers, customers, or company products negatively affected his team and ultimately led to the lawful termination of his at-will employment.

Plaintiff now claims LNRS terminated him for taking CFRA leave to care for his terminally-ill sister. The record forecloses that claim. In addition to Plaintiff's own admissions, the testimony of management witnesses confirmed Plaintiff's consistent underperformance and negative impact on his team. This testimony is buttressed by considerable pre-leave documentation—including a negative performance review for 2023 and written disciplinary action in February 2024—illustrating Defendants' legitimate concerns about Plaintiff before he requested (and was granted) protected leave for the first time on March 7, 2024. In fact, Plaintiff's manager (Linda Spinner) expressed a desire to move Plaintiff out of the business in January 2024, and engaged with Employee Relations to prepare a Performance Improvement Plan ("PIP) for Plaintiff over one month *before* he notified management of his sister's illness and need for leave. Spinner

1

even placed an invitation for March 6, 2024 on his calendar to discuss the PIP (which Plaintiff accepted on March 4, 2024). While this PIP was rescinded days before Plaintiff requested leave because it had been prematurely entered into Workday before finalization, management's underlying concerns remained unchanged. Then, days later, Plaintiff requested a leave of absence, and management simply deferred implementation of the PIP until Plaintiff's return.

Because Plaintiff's longstanding, well-documented performance shortcomings were the exclusive reason for his termination, and predate Plaintiff's request for a leave of absence, Plaintiff cannot establish a causal nexus between his CFRA leave and his termination. Defendants are accordingly entitled to summary judgment on Plaintiff's claim for retaliation in violation of CFRA as well as his duplicative claim for wrongful termination in violation of public policy.

Furthermore, as set forth in LNRS's counterclaim, Plaintiff still owes LNRS at least $39,025 of the duplicative retention bonus that he was erroneously paid in 2021. Despite Plaintiff's agreement to repay at least one-half of this amount to LNRS by June 30, 2024, Plaintiff did not do so (and still has not done so). And, under the clear terms of the repayment agreement between LNRS and Plaintiff, Plaintiff's failure to pay this amount, as agreed, was an additional basis for his termination in July 2024.

Consequently, LNRS is entitled to summary judgment on its counterclaim for breach of the repayment agreement for the duplicative retention bonus he received. Plaintiff admitted at deposition that he has "never disputed" that he owes LNRS the duplicative retention bonus. Plaintiff further admitted he has made no payments under the Repayment Agreement other than a single claimed $2,000 payment (and that check did not clear Plaintiff's account). LNRS is therefore entitled to summary judgment on its breach of contract counterclaim in at least the amount Plaintiff admits he owes and has never paid.

2

## II.    FACTS NOT SUBJECT TO REASONABLE DISPUTE

### A.    The Parties

LNRS is a business unit of RELX. SUF 1. Plaintiff is a former employee of LNRS.[1] SUF 2. LNRS employed Plaintiff in its London office from approximately 2011 to 2018. SUF 4. In 2018, LNRS transferred Plaintiff to the United States after Plaintiff's wife was hired by a U.S.-based company. SUF 5. Following his transfer, Plaintiff transitioned to the role of Director of Sales for LNRS. SUF 6. At all times Plaintiff was an at-will employee. SUF 7.

### B.    Plaintiff Receives a Duplicative Retention Bonus, Which He Never Repaid

In August 2021, LNRS inadvertently paid Plaintiff a duplicative retention bonus of $75,000 ("Duplicative Retention Bonus"). SUF 8. Shortly thereafter (within two or three months of the duplicative payment), Human Resources reached out to Plaintiff to address the overpayment. SUF 9. Plaintiff acknowledged receipt of the duplicative payment. SUF 10.

Discussions about repayment culminated on January 22, 2024, when Plaintiff finally signed a Repayment of Duplicative Retention Bonus Agreement ("Repayment Agreement"). SUF 11. Pursuant to the Repayment Agreement, Plaintiff agreed to repay the Duplicative Retention Bonus in the after-tax net amount of $41,025 over the course of the following twelve months, beginning in December 2023, with one-half of the agreed repayment amount of $20,512.50 to be paid by June 30, 2024, and the balance no later than December 31, 2024. SUF 12. Plaintiff also acknowledged and agreed that "his failure to timely repay one half of the Duplicative Retention Bonus by June 30, 2024, or all of the Duplicative Retention Bonus by December 31, 2024 . . . may result in disciplinary action, up to and including termination." SUF 13.

---

[1]    Plaintiff was hired by Accuity Inc. ("Accuity") in 2011. Shortly thereafter, Accuity was acquired by a subsidiary of RELX. In 2021, Accuity was merged into LNRS. SUF 3.

3

At deposition, Plaintiff conceded that he has "never disputed this once." SUF 14. Although Plaintiff claimed he made a $2,000 payment toward the amount owed under the Repayment Agreement, he admitted he did not pay one-half of the amount owing by June 30, 2024 and that he has made no payments other than the alleged $2,000 payment.[2] SUF 15.

### C.   Plaintiffs Is Assigned a New Role

In September 2023, LNRS Senior Vice President of Strategic Sales, Joe Gaines ("Gaines"), informed Plaintiff that LNRS was reorganizing the Business Services sales team and as a result, Plaintiff would be reporting to a new direct supervisor. SUF 16. Under the restructuring, Plaintiff joined the Core Strategic Digital Markets and began reporting to LNRS Sales Director, Linda Spinner ("Spinner"). SUF 17. Plaintiff was also informed that his role was being changed from a coaching role to a "player-coach" role, adding direct sales responsibilities to his job duties. SUF 18. Plaintiff would also be selling products that were new to him, and which he would need to learn. SUF 19.

Plaintiff initially did not accept the new role and told Gaines he needed time to think about it. SUF  20. Gaines agreed, but informed Plaintiff that the new role was his only option if he wanted to stay with the company. SUF 21. Plaintiff then suggested to Spinner's superior Jim MacKillop ("MacKillop"), that Plaintiff should continue to work in the role he had previously worked, and that Gaines had approved of this, which was not true. SUF 22. Plaintiff ultimately accepted his new role, which was to begin on January 1, 2024. SUF 23.

### D.   Plaintiff's Performance Issues and Lack of Engagement

In his 2023 Performance Review, Plaintiff was rated "Requires Improvement"–the lowest possible ranking at LNRS. SUF 24. Dave Lindsay, Plaintiff's manager prior to the re-organization, wrote:

---

[2]   LNRS disputes that Plaintiff made this $2,000 payment, as the single payment check Plaintiff sent to LNRS did not clear his bank account, but accepts Plaintiff's contention as true solely for the purposes of this motion.

4

> [C]ore counterpart Directors are not hearing from Nick nor do they have any understanding of his team's strategy and engagement with core.
>
> During this last quarter and transition to Jim's team, a recurring theme has been Nick's lack of engagement, from Jim and his Directors, including missing calls and not being present. There has also been limited engagement with his own team, not attending his own team calls on multiple occasions. I have observed Nick being late to my Director calls and late on many deadline requests, requiring reminders. I have had members of Nick's team reach out directly to me asking for help on topics Nick should be managing."
>
> I also spoke with him earlier this year about rebuilding and repairing his relationships with Jim's team after partnering rep challenges from 2022.
>
> Much work is still needed across the DM leadership team based on multiple discussions I've had with Jim and his directors over the second half of 2023.

SUF 25.

Plaintiff's dismissive behavior and lack of engagement became more egregious after the restructuring announcement. On January 3, 2024, Plaintiff went on vacation to visit family in the United Kingdom. SUF 26. Plaintiff did not seek approval for his trip in advance. Plaintiff returned to work on January 11, 2024. SUF 28.

On January 6, 2024, while Plaintiff was still on holiday, Spinner sent Plaintiff an email listing the objectives of his new role because, during her last call with Plaintiff, Plaintiff had expressed "confusion about the roles and responsibilities for the player/coach role on my team" and to give him "an understanding of the expectations, as the objectives listed below will be the basis for the KPOs [Key Performance Objectives] that you will need to update into Workday later this month." SUF 29. These objectives included (1) "Core Focused Onboarding," (2) "Account Ownership Responsibilities," and (3) "Daily Work Effort." SUF 30. The first objective focused largely on training and preparation "to be actively engaged in SKO" (Sales Kick Off, a three-day, annual event occurring later that month) and training and certification on the new core products Plaintiff would be selling, which Plaintiff needed to complete within the first six months of his new role. SUF 31. The second objective included various account related activities

5

and closed business. SUF 32. The third objective including, among others, attending regularly scheduled calls and assigned trainings, providing Spinner with weekly "Radar Reports" on Plaintiff's work activities, and inputting accurate and timely sales-related information into the Salesforce program. SUF 33.

Shortly after his return in January, and contrary to the third objective listed in Spinner's email, Plaintiff was late for his first customer call, with The Bancorp, which Spinner was also attending. SUF 34. After the call, Spinner called Plaintiff and asked him why he had been late for his very first customer call, to which Plaintiff replied, "Linda can we just keep this positive," resulting in Spinner becoming frustrated. SUF 35.

During the following week, and contrary to the second and third objectives listed in Spinner's "objectives" email, Plaintiff failed to send Spinner his required Friday Radar Report, and failed to set up a call with another customer, Netspend, which was being transferred to Plaintiff, even though he had been expressly asked to do so. SUF 36.

Similarly, also contrary to the first objective in Spinner's "objectives" email, Plaintiff was not actively engaged in the Sales Kick Off event at the end of January. To the contrary, Plaintiff arrived late on the first day, sat at a back table, and did not engage with his team. SUF 37. Plaintiff then left the Sales Kick Off early on the first day and did not return, instead flying home, citing that he did not feel well. SUF 38.

On January 22, 2024, Spinner emailed Human Resources a summary of Plaintiff's performance deficiencies and lack of engagement, expressing a desire to move him out of the business as soon as possible. SUF 39. On January 31, 2024, Spinner opened an Employee Relations Report with LNRS Employee Relations to initiate potential disciplinary action against Plaintiff. SUF 40. Among other things, Spinner reported that as follows:

> [Plaintiff] has been absent from role and not adaptive to changes. Since changed has not engaged with team. After 19 days have not spoken to his team. . . . Employee had 2.5 months where he had the opportunity to learn more of the role. First couple weeks of year took off.

6

> Linda spoke to [Plaintiff] in November. He was still approaching situation as negotiation. . . . She did not hear from him for 2 weeks. . . . Prior to sales kick off had a lot of training that needed to be done. Got reporting on training and employee took off and did not complete the training he completed 3 of the 19. The employee was out until the 9th of Jan. She reached out to [Plaintiff's prior manager], and he had not put in the request prior to going on vacation. The 9th employee did not show up. He came back on the 11th. Sales kick off was following week.
>
> Employee shows up for sales meeting. Showes up late. Sitting in back table. When it comes time to work on project he does not engage with team. End of session tells her he is not feeling well. Did not hear from him rest of day did not show next sessions. Emailed her following day advised he was not feeling well and went home. . . .

SUF 41.

Plaintiff's disappointing behavior continued, and on February 26, 2024, Employee Relations issued a Disciplinary Action Written Warning for "General Misconduct." SUF 42. The Disciplinary Action noted Plaintiff's performance failings and clearly outlined management's expectations. For example, the Disciplinary Action states "the expectations require for this role is one of respect and accountability. Taking responsibility and managing accounts . . . engaging with customers and finding ways to meet & exceed their needs . . . and at all-time[s] be professional and courteous to Management, Stakeholders, and Employees." SUF 43.

Ultimately, management decided to place Plaintiff on a 30-day PIP in order to remedy the performance issues outlined in the Disciplinary Action. Management began to circulate a draft PIP as early as February 2024. SUF 44. Because Spinner had inadvertently submitted (rather than saved) the draft PIP in Workday, Plaintiff received a copy of the draft PIP. SUF 45. The PIP was rescinded by Employee Relations shortly after Plaintiff received it because the PIP had not yet been finalized. SUF 46. Plaintiff conceded at deposition that he did not know why the PIP was rescinded. SUF 47.

On March 4, 2024, Employee Relations sought to meet with Plaintiff to discuss the parameters of his PIP, and Spinner sent a Microsoft Teams meeting invitation for March 6, 2024 to Plaintiff with the subject line "Performance Plan Delivery with HR." Plaintiff accepted this invitation the same day. This meeting was later rescheduled for March 8,

2024. SUF 48. However, on March 7, for the first time, Plaintiff informed Gaines about his sister's illness and his need for leave. SUF 49. Plaintiff admitted at deposition that this request for leave on March 7 was his first and only request for leave, and that his request for protected leave was granted, without any issue. SUF 50. Plaintiff also admitted at deposition that he was made aware of concerns about his performance before he ever asked for protected leave. SUF 51. However, Plaintiff's leave ultimately delayed the implementation of the PIP until his return. SUF 52.

### A. Plaintiff's Failure to Meet the PIP's Reasonable Objectives

Plaintiff took a protected leave of absence from March 10, 2024, to April 28, 2024. SUF 53. During this period of leave, LNRS restricted Plaintiff's access to IT because employees, like Plaintiff, who are out on a protected leave of absence are not permitted to work, and Plaintiff had expressed a desire to continue "attend[ing] calls" during his leave. SUF 54. Plaintiff also admitted at deposition that, while he had wanted to take more leave, it was ultimately Plaintiff's own decision to return to work after about eight weeks of leave. SUF 55.

Following Plaintiff's return from leave, the thirty-day PIP was initiated on May 2, 2024. SUF 56. The PIP outlined the following Performance Improvement Objectives:

> Certification and active demonstration of product fit knowledge while working plan. Successful Associate Certification. including, but not limited to exam, & value prop presentations Active dialog with clients in wide array of product sets during plan period (BRM, F&1, CRD, FCC). Certification 6/3/2024.

> Individual Selling and Coaching Weekly One on Ones with direct report and leadership to track performance/activities. Weekly Radar 5/6/2024

> Secure incremental revenue Minimum $100,000 closed by end of PlP. 6/3/2024

> Timely response and accurate follow up on all open action items and tasks. Respond to emails within 4 hours (during the work day. All tasks and open action items need to be completed within 24 hours. CC Linda Spinner, Brittany Kirstein Attend scheduled calendar invites and be prepared to run them for each call you are primary on. 5/6/2024

8

Transition from planning to action Presentation to leadership. initiation of proactive client outreach
5/15/2024

Work plan. Client engagement and opportunity identification Minimum $750,000 of SF Opportunity (created starting 1/1/2024) by end of plan. Half of this amount in Stage 3 or higher.
6/3/2024

SUF 57.

Throughout the PIP, Spinner spent an average of five hours per week working with Plaintiff in order for him to achieve the above-listed objectives. SUF 58. Spinner attended Plaintiff's customer calls and held weekly one-on-one meetings. SUF 59. By Plaintiff's own estimation, the weekly calls with Spinner were productive, and it was clear to him what the performance objectives were. SUF 60. Plaintiff also received progress notes on his PIP from Spinner. SUF 61.

The objectives listed in the PIP were reasonable and achievable. Gaines testified that neither he nor other members of management—including Spinner and MacKillop—had a mindset to terminate Plaintiff, but wanted to see if Plaintiff could succeed on the PIP. SUF 62. To that end, Gaines carefully reviewed the first draft of the PIP prepared by Spinner, looking at the objectives that were being proposed one by one, based on the knowledge he had being in his role for a significant period, to make sure that the PIP would be fair and would give Plaintiff an opportunity to be successful. SUF 63. Gaines did this because, in his view, the very purpose of a PIP is to coach towards success following completion of the PIP. *Id*. Although Gaines believed the objectives set forth on the original draft of the PIP were achievable, he made various adjustments where he believed appropriate. SUF 64. As a result, the objectives in the PIP were achievable within the PIP's 30-day period. SUF 65. For example, the third objective (securing a minimum of $100,000 closed incremental revenue) was "very achievable" within a 30-day period because, among other things, Plaintiff had inherited existing sales opportunities when he assumed his new role, and likely also had sales opportunities that could be carried over by Plaintiff from his prior role. SUF 66. Similarly, the last-listed objective ("Minimum $750,000 of SF Opportunity created starting 1/1/2024 by end of plan. Half of

9

this amount in Stage 3 or higher") was achievable because it did not require Plaintiff to close any sales, only to identify sales opportunities for himself and his team and log them into the company's Salesforce program.[3] SUF 67. The objective was further reasonable because the length of sales cycles for applicable LNRS products can be less than one month from identification of the opportunity to close of the sale. SUF 69.

However, despite the reasonableness of the PIP's objectives, and the concerted effort by Spinner to meet with and coach Plaintiff, Plaintiff failed to meet the outlined objectives. Plaintiff admitted as much. For example, at deposition, Plaintiff admitted he did not secure incremental minimum revenue of $100,000, as required by the third objective. SUF 70. Indeed, Plaintiff failed to secure *any* incremental revenue. SUF 71. Plaintiff also admits he did not achieve the last-listed objective—logging into the Salesforce program a minimum of $750,000 of potential sales possibilities. SUF 72. In fact, throughout his tenure in the new role and while on the PIP, Plaintiff *failed to close a single deal*. SUF 73. Due to Plaintiff's continued failings, the PIP was deemed unsuccessful, and he was notified of his termination on July 2, 2024. SUF 74.

Following his termination, Plaintiff attempted to negotiate a severance with LNRS in a series of emails. In this email correspondence, Plaintiff expressed an opinion that his termination was unfair because the requirements of the PIP were purportedly "unrealistic" and because he had been "made to feel unwelcome" by Spinner since he started his new role at the beginning of January 2024. SUF 75. In response, LNRS informed Plaintiff that "[d]ue to your breach of the retention bonus contract as well as your failure to meet the objectives of the PIP, the Company ended your employment and will not be offering you severance." SUF 76. Plaintiff made no mention in these email messages of any purported belief that he had been retaliated against for having taken CFRA leave. SUF 77.

---

[3]   "Stage 3" is the stage where a customer is at least willing to consider or test an LNRS product. SUF 68.

## III.   LEGAL STANDARD

A moving party is entitled to summary judgment if it demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the nonmoving party's case. *Id*. at 325. Instead, the moving party need only point out there is an absence of evidence to support the nonmoving party's case. *Id.; In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "This burden is not a light one. The nonmoving party must show more than the mere existence of a scintilla of evidence." *In re Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252).

## IV.   ARGUMENT

### A.   Plaintiff's Purported CFRA Retaliation Claim Fails (First Cause of Action)

#### 1.   Plaintiff Cannot Establish Causation

To establish a prima facie case of CFRA retaliation, a Plaintiff must demonstrate, among other requirements, that he "suffered an adverse employment action, such as termination . . . because of [his] exercise of [his] right to CFRA." *Dudley v. Dept. of Transportation* 90 Cal.App.4th 255, 261 (2001); *accord Delgado v. United Facilities, Inc.*, No. 2:11-cv-485 2012 U.S. Dist. LEXIS 21527, *21-22 (E.D. Cal. Feb. 7, 2012),

11

*21-22 E.D. Cal. Feb. 7, 2012). "Significantly, the necessity of a causal link is a part of a plaintiff's *prima facie* case of retaliation." *Chen v. City of Orange,* 96 Cal. App. 4th 926, 948 (2002) (citing *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 591, 614 (1989).) "Only after such a prima facie case is made does the case progress to the familiar burden-shifting analysis typically used to test discrimination claims on the merits:" *Id.*

The key to this case, and the reason why Plaintiff's claims fail, is the timing. As detailed above, ***well before*** his first and only request for protected leave on March 7, 2024, Plaintiff had ongoing and documented performance and behavioral issues. In 2023, his performance was rated as "requires improvement"—the lowest of four possible ratings at LNRS—based on lack of engagement and missed deadlines. SUF 24, 25. Those issues escalated following the October 2023 restructuring. At that time, Plaintiff resisted his new role, dismissed guidance from both Spinner and MacKillop, and simply refused to become familiar with the products he would be responsible for supporting. SUF 35, 36. Plaintiff also failed to timely complete required trainings, took unapproved absences, skipped nearly all of the Sales Kick-Off, acted unprofessionally toward his manager, failed to attend team meetings, and disengaged from customer responsibilities. SUF 26, 27, 34, 35, 36, 37, 38, 39, 40.

This pattern of conduct resulted in disciplinary action in February 2024—***weeks before*** Plaintiff even informed anyone in management about his need for a leave of absence. SUF 40, 41, 42. Moreover, Plaintiff's conduct through January 2024 forced Spinner to begin discussions about separating his employment as early as January 2024, again predating any CFRA leave request. SUF 40. In furtherance of that process, Spinner prepared a PIP, and Employee Relations scheduled a meeting with Plaintiff to discuss the PIP ***before*** Plaintiff informed Defendants of any intent to take leave. SUF 43, 44, 45, 46, 47.

Contemporaneous documentation reflects consistent concerns regarding Plaintiff's performance and behavior, all arising ***independently of—and prior to***—his leave request. SUF 24, 25, 39, 40, 41, 42, 47. Against this record, Plaintiff cannot establish any causal

12

connection between his leave and his termination. Accordingly, his CFRA retaliation claim is not supported by the facts and is subject to summary judgment. *Chen,* 96 Cal. App. 4th at 948 (affirming summary judgment on retaliation claim, where conduct that resulted in counseling occurred before employee engaged in protected activity).

### 2. LNRS Was Also Entitled to Terminate Plaintiff's Employment for His Breach of the Repayment Agreement

In August 2021, LNRS inadvertently paid Plaintiff a duplicative retention bonus of $75,000. SUF 8. Shortly thereafter, Employee Relations reached out to Plaintiff to address the overpayment. SUF 9. Plaintiff acknowledged receipt of the Duplicative Retention Bonus as well as the fact that he was not entitled to the payment he received. SUF 10. After failing to repay the duplicative retention bonus, Plaintiff signed the Repayment Agreement on January 22, 2024, *weeks before* he first informed LNRS of his need for leave to care for his sister. SUF 11. Pursuant to the Repayment Agreement, Plaintiff agreed to repay the Duplicative Retention Bonus in the after-tax net amount of $42,025 over the course of the succeeding twelve months, beginning in December 2023, with one-half of the agreed repayment amount of $20,512.50 to be paid by June 30, 2024, and the balance by no later than December 31, 2024. SUF 12. Plaintiff also acknowledged and agreed that "his failure to timely repay one half of the Duplicative Retention Bonus by June 30, 2024, or all of the Duplicative Retention Bonus by December 31, 2024 . . . may result in disciplinary action, up to and including termination." SUF 13.

At deposition, Plaintiff admitted he has "never disputed" that he was not entitled to, and therefore owes LNRS, the Duplicative Retention Bonus. SUF 14. Further, although Plaintiff claimed to have made a $2,000 payment toward the amount owed under the Repayment Agreement, he admitted he did not pay one-half the agreed payment amount by June 30, 2024, and that he has made no payments other than the claimed $2,000 payment. SUF 15. LNRS was therefore entitled to terminate Plaintiff's employment for the independent, non-retaliatory reason that he breached the Repayment

13

Agreement, the express terms of which entitled LNRS to terminate Plaintiff's employment.

### B.    Plaintiff's Duplicative Claim for Termination in Violation of Public Policy Also Fails

Plaintiff's wrongful termination claim is derivative of his underlying statutory claim. To succeed on a claim of wrongful termination in violation of public policy, Plaintiff must show that his termination violated a fundamental public policy. *See Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1251 (1994). Because Plaintiff's statutory claim for retaliation fails as a matter of law, his derivative wrongful termination claim also fails. *Muller v. Automobile Club of So. California*, 61 Cal.App.4th 431, 450-51 (1998) (claim for tortious dismissal in violation FEHA dismissed as no merit to statutory claim).

### C.    LNRS Is Entitled to Summary Judgment on its Counterclaim for Breach of the Repayment Agreement

As set forth above, pursuant to the Repayment Agreement, Plaintiff agreed to repay the Duplicative Retention Bonus in the amount of $41,025 over the course of the succeeding twelve months, beginning in December 2023, with one-half of the agreed repayment amount of $20,512.50 to be paid by June 30, 2024, and the balance by no later than December 31, 2024. SUF 11, 12. As further set forth above, Plaintiff admitted at deposition that he has "never disputed" that he owes LNRS the Duplicative Retention Bonus. SUF 14. Plaintiff further admitted he has made no payments under the Repayment Agreement other than a single, claimed $2,000 payment. SUF 15. LNRS is therefore entitled to summary judgment on its counterclaim for Plaintiff's breach of the Repayment Agreement in the net in the after-tax net amount of $39,025 ($41,025 less the claimed $2,000 payment).

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted, dismissing with prejudice Plaintiff's First and Second Causes of Action against

14

Defendants and awarding judgment to LNRS in the amount of $39,025 on its counterclaim for breach of the Repayment Agreement.

DATED: June 23, 2026.

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/Ryan McCoy*
Ryan McCoy
Clara L. Rademacher
Attorneys for Defendants
RELX INC. and LEXIS-NEXIS RISK SOLUTIONS FL INC.

15

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants RELX Inc. and LEXIS-NEXIS Risk Solutions Fl Inc., certifies that this Memorandum of Points and Authorities contains 5,283 words, including headings, footnotes, and quotations, but excluding the caption, the table of contents, the table of authorities, the signature block, and the certification required by L.R. 11-6.2, according to the word count feature of Microsoft Word, which complies with the word limit of L. R. 11-6-1.

DATED: June 23, 2026

Respectfully submitted,

SEYFARTH SHAW LLP


By: */s/Ryan McCoy*
Ryan McCoy
Clara L. Rademacher
Attorneys for Defendants
RELX INC. and LEXIS-NEXIS RISK SOLUTIONS FL INC.

16