SEYFARTH SHAW LLP
Ryan McCoy (SBN 276026)
mccoy@seyfarth.com
Clara L. Rademacher (SBN 355494)
crademacher@seyfarth.com
560 Mission Street, 31st Floor
San Francisco, California 94105
Telephone:   (415) 397-2823
Facsimile:   (415) 397-8549

Attorneys for Defendants
RELX INC. and LEXIS-NEXIS RISK
SOLUTIONS FL INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS MCARTHUR, an individual, | Case No. 2:25-cv-06120-SK |
| Plaintiff, | **DEFENDANTS RELX INC. AND LEXIS-NEXIS RISK SOLUTIONS FL INC.'S STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RELX INC., a Delaware Corporation, LEXIS-NEXIS RISK SOLUTIONS FL INC., a Minnesota Corporation; and DOES 1 through 50, inclusive, | |
| Defendants. | Date:         July 29, 2026<br>Time:         10:00 a.m.<br>Location:   Courtroom 540, 5th Floor<br>                  Edward R. Roybal Federal<br>                  Building<br>Judge:       Honorable Steve Kim |
| | Complaint Filed:              6/3/25<br>Removed to Federal Court:   7/7/25 |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and L.R. 56-1, Defendants RELX INC. and LEXIS-NEXIS RISK SOLUTIONS FL INC. (collectively, "Defendants") hereby submit the following Statement of Uncontroverted Facts in support of their Motion for Summary Judgment as to the Complaint of Plaintiff NICHOLAS McARTHUR ("Plaintiff"):

| No. | Uncontroverted Material Fact | Supporting Evidence |
| --- | --- | --- |
| 1. | LNRS is a business unit of RELX. | Second Amended Complaint ("SAC") ¶ 5. |
| 2. | Plaintiff is a former employee of LNRS. | SAC ¶ 5. |
| 3. | Plaintiff was hired by Accuity Inc. ("Accuity") in 2011. Shortly thereafter, Accuity was acquired by a subsidiary of RELX. In 2021, Accuity was merged into LNRS. | Transcript of Deposition of Nicholas McArthur ("McArther Tr."), 70:21-71:6. |
| 4. | LNRS employed Plaintiff in its London office from approximately 2011 to 2018. | SAC ¶ 8. |
| 5. | In 2018, LNRS transferred Plaintiff to the United States after Plaintiff's wife was hired by a U.S.-based company. | SAC ¶ 8; McArther Tr. 46:22-48:2. |
| 6. | Following his transfer, Plaintiff transitioned to the role of Director of Sales for LNRS. | SAC ¶ 8; McArthur Tr. 47:11-13. |
| 7. | At all times, Plaintiff was an at-will employee. | Ex. 7; McArther Tr. 71:21-72:1. [1] |
| 8. | In August 2021, LNRS inadvertently paid Plaintiff a duplicative retention bonus of $75,000 ("Duplicative Retention Bonus"). | McArthur Tr. 202:16-203:11, 205:23-206:2, 209:19-22. |
| 9. | A few months or so after payment of the Duplicative Retention Bonus, Employee Relations reached out to Plaintiff to address the overpayment. | McArthur Tr. 207:2-10. |
| 10. | Plaintiff acknowledged receipt of the Duplicative Retention Bonus. | McArthur Tr. 207:2-10, 209:19-22. |
| 11. | On January 22, 2024, Plaintiff signed a Repayment of Duplicative Retention | Ex. 26; McArthur Tr. 202:16-203:11. |

[1] References to "Ex." are references to Exhibits to the Deposition of Nicholas McArthur.

RELX INC. AND LEXIS-NEXIS RISK SOLUTIONS FL INC.'s STATEMENT OF UNCONTROVERTED FACTS ISO MOTION FOR SUMMARY JUDGMENT

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
|  | Bonus Agreement ("Repayment Agreement"). |  |
| 12. | Pursuant to the Repayment Agreement, Plaintiff agreed to repay the Duplicative Retention Bonus in the after-tax net amount of $41,025 over the course of the following twelve months, beginning in December 2023, with one-half of the agreed repayment amount of $20,512.50 to be paid by June 30, 2024, and the balance no later than December 31, 2024. | Ex. 26 ¶ 2. |
| 13. | Plaintiff acknowledged and agreed that "his failure to timely repay one half of the Duplicative Retention Bonus by June 30, 2024, or all of the Duplicative Retention Bonus by December 31, 2024 . . . may result in disciplinary action, up to and including termination." | Ex. 26 ¶ 8. |
| 14. | At deposition, Plaintiff admitted that he has "never disputed [that Plaintiff owed LNRS repayment of the Duplicative Retention Bonus] once." | McArthur Tr. 203:25-204:1. |
| 15. | Plaintiff claimed he made a $2,000 payment toward the amount owed under the Repayment Agreement, but admitted he did not pay one-half of the amount owing by June 30, 2024 and that he has made no payments other than the alleged $2,000 payment. | McArthur Tr. 206:3-17, 212:3-5. |
| 16. | In September 2023, LNRS Senior Vice President of Strategic Sales, Joe Gaines ("Gaines"), informed Plaintiff that LNRS was reorganizing the Business Services sales team and as a result, Plaintiff would be reporting to a new direct supervisor. | McArthur Tr. 75:6-77:6. |
| 17. | Under the restructuring, Plaintiff joined the Core Strategic Digital Markets and began reporting to LNRS Sales Director, Linda Spinner ("Spinner"). | McArthur Tr. 82:17-83:20, 87:2-88:11. |
| 18. | Plaintiff was also informed that his role was being changed from a coaching role to a "player-coach" role, | McArthur Tr. 102:20-104:10. |

2

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| | adding direct sales responsibilities to his job duties. | |
| 19. | Plaintiff would also be selling products that were new to him, and which he would need to learn. | McArthur Tr. 95:22-96:24. |
| 20. | Plaintiff initially did not accept the new role and told Gaines he needed time to think about it. | McArthur Tr. 87:23-88:11. |
| 21. | Gaines agreed that Plaintiff could think about the new role, but informed Plaintiff that the new role was his only option if he wanted to stay with the company. | McArthur Tr. 88:12-23; Transcript of the Deposition of Joe Gaines ("Gaines Tr.") 50:18-52:21. |
| 22. | Plaintiff then suggested to Spinner's superior Jim MacKillop ("MacKillop"), that Plaintiff should continue to work in the role he had previously worked, and that Gaines had approved of this, which was not true. | Gaines Tr. 50:18-52:21. |
| 23. | Plaintiff ultimately accepted his new role, which was to begin on January 1, 2024. | McArthur Tr. 93:15-17. |
| 24. | In his 2023 Performance Review, Plaintiff was rated "Requires Improvement"–the lowest possible ranking at LNRS. | Ex. 18; McArthur Tr. 150:5-21. |
| 25. | In Plaintiff's 2023 Performance Review, Dave Lindsay, Plaintiff's manager prior to the re-organization, wrote:<br><br>C]ore counterpart Directors are not hearing from Nick nor do they have any understanding of his team's strategy and engagement with core.<br><br>During this last quarter and transition to Jim's team, a recurring theme has been Nick's lack of engagement, from Jim and his Directors, including missing calls and not being present. There has also been limited engagement with his own team, not attending his own team calls on multiple occasions. I have observed Nick being late to my Director calls and late on many | Ex. 18. |

3

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| | deadline requests, requiring reminders. I have had members of Nick's team reach out directly to me asking for help on topics Nick should be managing." I also spoke with him earlier this year about rebuilding and repairing his relationships with Jim's team after partnering rep challenges from 2022. Much work is still needed across the DM leadership team based on multiple discussions I've had with Jim and his directors over the second half of 2023. | |
| 26. | On January 3, 2024, Plaintiff went on vacation to visit family in the United Kingdom. | McArthur Tr. 89:15- 91:18. |
| 27. | Plaintiff did not seek approval for his trip in advance. | McArthur Tr. 90:7-91:18. |
| 28. | Plaintiff returned to work on January 11, 2024. | McArthur Tr. 89:15- 91:6; Ex. 12, at 2. |
| 29. | On January 6, 2024, while Plaintiff was still on holiday, Spinner sent Plaintiff an email listing the objectives of his new role, stating that during her last call with Plaintiff, Plaintiff had expressed "confusion about the roles and responsibilities for the player/coach role on my team" and to give him "an understanding of the expectations, as the objectives listed below will be the basis for the KPOs [Key Performance Objectives] that you will need to update into Workday later this month." | Ex. 9; McArthur Tr. 93:22-94:22. |
| 30. | These objectives included (1) "Core Focused Onboarding," (2) "Account Owner-ship Responsibilities," and (3) "Daily Work Effort." | Ex. 9. |
| 31. | The first objective focused largely on training and preparation "to be actively engaged in SKO" (Sales Kick Off, a three-day, annual event occurring later that month) and training and certification on the new | Ex. 9; McArthur Tr. 95:22-97:18. |

4

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
|  | core products Plaintiff would be selling, which Plaintiff needed to complete within the first six months of his new role. |  |
| 32. | The second objective included various account related activities and closed business. | Ex. 9. |
| 33. | The third objective including, among others, attending regularly scheduled calls and assigned trainings, providing Spinner with weekly "Radar Reports" on Plaintiff's work activities, and inputting accurate and timely sales-related in-formation into the Salesforce program. | Ex. 9; McArthur Tr. 101:5-15. |
| 34. | Shortly after his return in January, Plaintiff was late for his first customer call, with The Bancorp, which Spinner was also attending. | McArthur Tr. 108:2-11; Ex. 10. |
| 35. | After the call, Spinner called Plaintiff and asked him why he had been late for his very first customer call, to which Plaintiff replied, "Linda can we just keep this positive," resulting in Spinner becoming frustrated. | Ex. 10; McArthur Tr. 107:22-110:8. |
| 36. | During the following week, Plaintiff failed to send Spinner his required Friday Report, and failed to set up a call with another customer, Netspend, which was being transferred to Plaintiff, even though he had been asked to do so. | Ex. 11; McArthur Tr. 110:15-115:25. |
| 37. | Plaintiff arrived late to the first day of the LNRS Sales Kick Off event at the end of January 2024, sat at a back table, and did not engage with his team. | Ex. 12 at 2; McArthur Tr. 96:25-100:7, 110:15-115:25. |
| 38. | Plaintiff left the Sales Kick Off early on the first day and did not return, instead flying home, citing that he did not feel well. | McArthur Tr. 96:25-100:7. |
| 39. | On January 22, 2024, Spinner reached out to LNRS Employee Relations to outline some of her concerns about plaintiff's lack of engagement, | Declaration of Linda Spinner ("Spinner Decl.") ¶ 3, Ex. A. |

5

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
|  | disinterest in his new role, and negative attitude. After summarizing a number of Plaintiff's performance Spinner stated as follows:<br><br>Nick has made it extremely clear that he did not want this job, that he is unhappy reporting to me, and remains completely disengaged. I do not see any willingness to learn about any of our other solutions nor any desire to work with the team to become a contributing member.<br><br>**He has never once reached out to Katrin. He did not even speak to her at the sales meeting. I would like to move to move him out of our business as soon as possible. His attitude is negative and it is making things very uncomfortable for the rest of the team**. |  |
| 40. | On January 31, 2024, Spinner opened an Employee Relations Report with LNRS Employee Relations to initiate potential disciplinary action against Plaintiff. | Spinner Decl. ¶ 4 & Ex. B (Ex. 12 to McArthur Dep.). |
| 41. | Among other things, Spinner reported as follows:<br><br>[Plaintiff] has been absent from role and not adaptive to changes. Since changed has not engaged with team. After 19 days have not spoken to his team. . . .  Employee had 2.5 months where he had the opportunity to learn more of the role. First couple weeks of year took off.<br><br>Linda spoke to [Plaintiff] in November. He was still approaching situation as negotiation. . . . She did not hear from him for 2 weeks. . . . Prior to sales kick off had a lot of training that needed to be done. Got reporting on training and employee took off and did not complete the training he completed 3 of the 19. The employee was out until the 9th | Spinner Decl. Ex. B (Ex. 12 to McArthur Dep.). |

6

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| | of Jan. She reached out to [Plaintiff's prior manager], and he had not put in the request prior to going on vacation. The 9th employee did not show up. He came back on the 11th. Sales kick off was following week.<br><br>Employee shows up for sales meeting. Showes up late. Sitting in back table. When it comes time to work on project he does not engage with team. End of session tells her he is not feeling well. Did not hear from him rest of day did not show next sessions. Emailed her following day advised he was not feeling well and went home. . . . | |
| 42. | On February 26, 2024, LNRS Employee Relations issued a Disciplinary Action Written Warning for "General Misconduct." | Ex. 14; McArthur Tr. 133:7-136:11. |
| 43. | Among other things, the Disciplinary Action lists that as incident details:<br><br>1/21: When questioned about being late for a customer meeting, the response was given with irritation. " Can't we just start this off with a positive note.""<br><br>1/28: During a discussion about goals and performance evaluation, the response was once again laced with anger and exasperation about an obsession for performance review.<br><br>lnsubordination<br><br>1/21: When Manager advises for you to manage tasks. You pass the account on to another employee.<br><br>Complying with RELX Policies<br><br>Attendance:<br><br>1/3/2024-1/10/2024: Took PTO the first 10 days of the year without prior approval and did not request via Workday until questioned.<br><br>2/19/2024: Did not request PTO | Ex. 14. |

7

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
|  | 2/20/2024 not able to reach by phone, email, or teams. No pto requested prior to date.<br><br>Phishing Attempt Training:<br><br>2/7/2024 2nd Phishing Attempt Failure<br><br>The Disciplinary Action states, in part:<br><br>The expectations require [sic] for this role is one of respect and accountability. Taking responsibility and managing accounts . . . engaging with customers and finding ways to meet & exceed their needs . . . and at all-time[s] be professional and courteous to Management, Stakeholders, and Employees." |  |
| 44. | During February 2024, Spinner put together a draft 30-day Performance Improvement Plan ("PIP") for Plaintiff in LNRS's Workday program, which Spinner circulated to other members of LNRS management in early March 2024 | Spinner Decl. ¶¶ 5-8 & Exs. C-F; Ex. 12, at 2; Transcript of the Deposition of Rodney Holton ("Holton Tr.") 34:24-35:2.. |
| 45. | Because Spinner had inadvertently submitted (rather than saved) the draft PIP in Workday, Plaintiff received a copy of the draft PIP. | Declaration of Rodney Holton ("Holton Decl.") ¶ 2. |
| 46. | The PIP was rescinded by Employee Relations shortly after Plaintiff received it because the PIP had not yet been finalized. | Holton Decl. ¶ 2. |
| 47. | Plaintiff admitted at deposition that he did not know why the PIP was rescinded. | McArthur Tr. 124:14-125:12. |
| 48. | On March 4, 2024, Employee Relations sought to meet with Plaintiff to discuss the parameters of his PIP, and Spinner sent Plaintiff a Microsoft Teams meeting invitation for March 6, 2024 to Plaintiff with the subject line "Performance Plan Delivery with HR." Plaintiff accepted this invitation the same day. This meeting was later rescheduled for March 8. | Exs. 15, 16, 17; McArthur Tr. 141:4-142:13, 147:22-149:23; Gaines Tr. 11:4-14; Spinner Decl. ¶ 7 and Ex. E. |

8

| No. | Uncontroverted Material Fact | Supporting Evidence |
|-----|------------------------------|---------------------|
| 49. | On March 7, Plaintiff informed Gaines about his sister's illness and his need for leave. | Ex. 4; McArthur Tr. 23:10-24:14. |
| 50. | Plaintiff admitted at deposition that this request for leave on March 7 was his first and only request for leave, and that his request for protected leave was granted, without any issue. | Ex. 19; McArthur Tr. 24:8-25:4, 25:21-27:18, 28:12-29:23, 160:22-161:11, 166:16-167:12. |
| 51. | Plaintiff also admitted at deposition that he was made aware of concerns about his performance before he ever asked for protected leave. | McArthur Tr. 128:20-25, 129:13-16, 130:3-15. |
| 52. | Plaintiff's leave ultimately delayed the implementation of the PIP until his return. | Ex. 12, at 3 ("Employee has left the country on leave. This pip will be placed on hold.") |
| 53. | Plaintiff took a protected leave of absence from March 10, 2024, to April 28, 2024. | McArthur Tr. 171:14-172:5. |
| 54. | During this period of leave, LNRS restricted Plaintiff's access to IT because employees, like Plaintiff, who are out on a protected leave of absence are not permitted to work and Plaintiff had expressed a desire to continue "attend[ing] calls" during his leave. | Ex. 4 (expressing desire to continue to attend calls), 21; McArthur Tr. 169:3-171:19. |
| 55. | Plaintiff admitted at deposition that, while he had wanted to take more leave, it was ultimately his own decision to return to work after about eight weeks of leave. | McArthur Tr. 36:3-21, 200:16-22. |
| 56. | Following Plaintiff's return from leave, a thirty-day PIP was initiated on May 2, 2024. | Ex. 22; McArthur Tr. 181:3-17. |
| 57. | The PIP outlined the following Performance Improvement Objectives: Certification and active demonstration of product fit knowledge while working plan. Successful Associate Certification. including, but not limited to exam, & value prop presentations Active dialog with clients in wide array of product sets during plan period | Ex. 22. |

9

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| | (BRM, F&1, CRD, FCC). Certification 6/3/2024. | |
| | Individual Selling and Coaching Weekly One on Ones with direct report and leadership to track performance/activities. Weekly Radar 5/6/2024 | |
| | Secure incremental revenue Minimum $100,000 closed by end of PIP. 6/3/2024 | |
| | Timely response and accurate follow up on all open action items and tasks. Respond to emails within 4 hours (during the work day. All tasks and open action items need to be completed within 24 hours. CC Linda Spinner, Brittany Kirstein Attend scheduled calendar invites and be prepared to run them for each call you are primary on. | |
| | 5/6/2024 | |
| | Transition from planning to action Presentation to leadership. initiation of proactive client outreach | |
| | 5/15/2024 | |
| | Work plan. Client engagement and opportunity identification Minimum $750,000 of SF Opportunity (created starting 1/1/2024) by end of plan. Half of this amount in Stage 3 or higher. | |
| | 6/3/2024 | |
| 58. | Throughout the PIP, Spinner spent an average of five hours per week working with Plaintiff in order for him to achieve the above-listed objectives. | Spinner Decl. ¶ 9. |
| 59. | Spinner attended customer calls with Plaintiff and held weekly one-on-one meetings with him. | McArthur Tr. 185:17-186:17. |
| 60. | Plaintiff testified that the weekly calls with Spinner were productive, and it was clear to him what the performance objectives were. | McArthur Tr. 186:18-21. |
| 61. | Plaintiff also received progress notes on his PIP from Spinner. | Exs. 23, 24; McArthur Tr. 187:20-25, 188:21-189:11, 191:22-193:13. |

10

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| 62. | Neither Joe Gaines nor other members of management—including Spinner and MacKillop—had a mindset to terminate Plaintiff, but wanted to see if Plaintiff could succeed on the PIP. | Transcript of Deposition of Joe Gaines ("Gaines Tr.") Tr. 9:19-10:14. |
| 63. | Gaines reviewed the first draft of the PIP prepared by Spinner, looking at the objectives that were being proposed one by one, based on the knowledge he had being in his role for a significant period, to make sure that the PIP would be fair and would give Plaintiff an opportunity to be successful, because the very purpose of a PIP is to coach towards success following completion of the PIP. | Gaines Tr. 11:15-13:1. |
| 64. | The objectives as set in the original draft of the PIP were achievable, but Gaines made various adjustments were he believed appropriate. | Gaines Tr. 13:3-15:3. |
| 65. | The objectives in the PIP were achievable within the PIP's 30-day period. | Gaines Tr. 11:15-13:1. |
| 66. | The third objective (securing a minimum of $100,000 closed incremental revenue) was "very achievable" within a 30-day period because, among other things, Plaintiff had inherited existing sales opportunities when he assumed his new role, and likely also had sales opportunities that could be carried over by Plaintiff from his prior role. | Gaines Tr. 31:24-33:4. |
| 67. | The last-listed objective ("Minimum $750,000 of SF Opportunity created starting 1/1/2024 by end of plan. Half of this amount in Stage 3 or higher") was achievable because it did not require Plaintiff to close any sales, but only to identify sales opportunities for himself and his team and log them into the company's Salesforce program. | Gaines Tr. 33:5-36:15. |
| 68. | "Stage 3" is the stage where a customer is at least willing to consider or test an LNRS product. | Gaines Tr. 33:9-34:5. |

11

| No. | Uncontroverted Material Fact | Supporting Evidence |
|-----|------------------------------|---------------------|
| 69. | The length of sales cycles for applicable LNRS products can be as short as less than one month from identification of the opportunity to close of the sale. | Gaines Tr. 35:15-37:12. |
| 70. | At deposition, Plaintiff admitted he did not secure incremental minimum revenue of $100,000, as required by the third objective listed in the PIP. | McArthur Tr. 183:23-184:11, 195:11-22. |
| 71. | Plaintiff failed to secure any incremental revenue during the PIP period. | McArthur Tr. 183:23-184:11, 195:11-22. |
| 72. | Plaintiff admits at deposition that he did not achieve the last-listed objective—logging into the Salesforce program a minimum of $750,000 of potential sales possibilities. | McArthur Tr. 184:12-185:8. |
| 73. | Throughout his tenure in the new role and while on the PIP, Plaintiff failed to close a single deal. | Ex. 25; McArthur Tr. 195:20-22, 200:23-202:12. |
| 74. | LNRS determined the PIP was unsuccessful, and notified Plaintiff of his termination for that reason on July 2, 2024. | Ex. 25; McArthur Tr. 186:6-12, 211:25-212:2. |
| 75. | Following his termination, Plaintiff attempted to negotiate a severance with LNRS in a series of emails. In this email correspondence, Plaintiff expressed an opinion that his termination was unfair because the requirements of the PIP were purportedly "unrealistic" and because he had been "made to feel unwelcome" by Spinner since he started his new role at the beginning of January 2024. | Ex. 27; McArthur Tr. 212:9-214:13. |
| 76. | In a reply to Plaintiff's initial email message requesting severance, LNRS informed Plaintiff that "[d]ue to your breach of the retention bonus contract as well as your failure to meet the objectives of the PIP, the Company ended your employment and will not be offering you severance." | Ex. 27, at 4 (email from Jimmy Hughto to Nick McArthur (July 3, 2024 21:06)) |

12

RELX INC. AND LEXIS-NEXIS RISK SOLUTIONS FL INC.'s STATEMENT OF UNCONTROVERTED FACTS ISO
MOTION FOR SUMMARY JUDGMENT

| No. | Uncontroverted Material Fact | Supporting Evidence |
|---|---|---|
| 77. | Plaintiff's email messages about severance do not mention any purported belief that Plaintiff had been retaliated against for having taken CFRA leave. | Ex. 27; McArthur Tr. 212:9-214:13. |

DATED: June 23, 2026

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/Ryan McCoy*
Ryan McCoy
Clara L. Rademacher
Attorneys for Defendants
RELX INC. and LEXIS-NEXIS RISK SOLUTIONS FL INC.

13