**RANEN KHADEMI PC**
Jeffrey S. Ranen (SBN 224285)
 jranen@ranenkhadeemi.com
Parisa Khademi (SBN 271897)
 pkhademi@ranenkhademi.com
Alec Morgan (SBN 351596)
 amorgan@ranenkhademi.com
Camden D. Swanson (SBN 355594)
 cswanson@ranenkhademi.com
12121 Wilshire Boulevard, Suite 810
Los Angeles, CA 90025
Telephone: (213) 789-6549

**JOSHUA KLUGMAN, ESQ.**
Joshua Klugman (SBN 236905)
 joshua@discriminationlawyerla.com
9538 Pico Blvd, No. 200
Los Angeles, CA 90035
Telephone: (424) 248-5148

Attorneys for Plaintiff
NICHOLAS MCARTHUR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS MCARTHUR, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>RELX INC, a Delaware Corporation, and DOES 1 through 50, inclusive,<br><br>        Defendants. | Case No.: 2:25-cv-06120-SK<br><br>[Assigned for all purposes to:<br>Hon. Robert B. Broadbelt, Dept. 53]<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Separate Statement; Declarations of Alec J. Morgan and Nicholas McArthur*]<br><br>**Date:  July 29, 2026**<br>**Time:  10:00 a.m.**<br>**Place:  Edward R. Roybal Federal Building**<br>**Judge: Hon. Steve Kim**<br><br>Action Filed:     June 3, 2025<br>Trial Date:       November 3. 2026 |

1

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    **INTRODUCTION** …………………………………………………………..[3]

II.   **STATEMENT OF RELEVANT FACTS** …………………………………[4]

A. **Contrary to Defendant's Assertions, Nick McArthur Cultivated a Fourteen-Year Career with RELX and a Record of Sustained High Performance.**……………...………………………...………….………..[4]

B. **Mr. McArthur Is Subjected to Internal Skepticism, Mockery, Mid-Protected-Leave Termination Planning, and Ultimate Retaliation for Taking Protected Leave to Care for His Dying Sister.**………..……..[6]

C. **The Unrealistic Metrics in the May 2, 2024 Performance Improvement Plan served as a Mere Pretext for Plaintiff's Eventual Termination.** …………………………………………………………..[7]

D. **Plaintiff's Failure to Repay a Duplicate Retention Bonus Was Explicitly Not a Factor in Plaintiff's Termination Decision as Testified to by Multiple Decisionmakers.**..……………..…………..[9]

E. **Plaintiff Recently Repaid the Bonus Monies Owed.** ……..………….[9]

III.  **LEGAL ARGUMENT**

A. **Defendant Is Not Entitled to Summary Judgment on Plaintiff's CFRA Retaliation Claim.**…………….…..……………………..[11]

i. There Are Multiple Genuine Disputes of Material Fact as to Plaintiff's *Prima Facie* Case of Retaliation. …………...…..[11]

B. **Defendant Is Not Entitled to Summary Judgment on Plaintiff's Wrongful Termination Claim.** …………………………………...[15]

IV.   **CONCLUSION** ……………………………………………………[15]

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Cases**
*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) ............11
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................11
*Morgan v. Regents of University of California*, 88 Cal. App. 4th 52 (2000)............11
*Soria v. Univision Radio Los Angeles, Inc.*, 5 Cal. App. 5th 570 (2016)..................11
*Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005) ...........................................11

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR
IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

## I.    INTRODUCTION

The present Motion for Summary Judgement must be denied because multiple disputes of material facts exist regarding the following critical issues, which include, among others:

1) Whether the original Performance Improvement Plan ("PIP") drafted within the days before Plaintiff's leave of absence contained performance metrics which were fair and/or achievable;

2) Whether the PIP, which was explicitly described as "garbage" and "unfair," by Plaintiff's supervisor's *supervisor* was rescinded for the aforementioned reasons;

3) Whether the distribution of the PIP on May 2, 2024, just two days following Plaintiff's return from protected leave, was retaliatory;

4) Whether Plaintiff's May 2, 2024 PIP's performance metrics remained unfair and unachievable;

5) Whether Operations took the advice of Human Resources to heed caution when handling this "high risk employee" versus instead of slamming its foot on the accelerator to terminate.

Defendant's Motion for Summary Judgment, supported by 77 so-called uncontroverted facts, must be denied because the following categories of material facts are fundamentally disputed:

1) Facts 8, 9, 10, 11, 12, 13, 14, and 15: Defendants' argument regarding causation relies heavily on the purported claim that Plaintiff's failure to fulfill repayment of the duplicative retention bonus was a factor in Plaintiff's termination. The foregoing facts are heavily disputed because defense witness deposition testimony from the relevant termination decisionmakers, Jim MacKillop, Linda Spinner, and Joseph Gaines, all stated that Plaintiff's failure to complete repayment played no role in the decision to terminate Nicholas McArthur.

4

2) Facts: 62, 64, 65, 66, 67, and 74: A significant portion of Defendant's argument relies on their assertion that the PIP was fair and achievable despite the fact that all available evidence is to the contrary. The operative PIP remained substantively unchanged from the previous version, which was described as "garbage", unfair, and not achievable.

3) Uncontroverted Facts: 20, 21, 24, 25, 26, 27, 29, 30, 45, 46, 48, 49, 50, and 51: There are numerous written communications between Plaintiff's supervisors in which they repeatedly mock and ridicule Plaintiff leave of absence and display utter disdain and disregard for input from Human Resources and Employee Relations advising caution.

Ultimately, the material facts in this case are probative of retaliation, indicative of pretext, and dispute the legitimacy of Defendant's termination rationale. Based on these facts, a reasonable jury could determine that Defendant's purported termination rationale lacks credibility, Mr. McArthur was retaliated against, and Defendant is liable for the associated damages. Defendant has failed to meet its significant burden of establishing that there is no genuine dispute of material fact as to each of Mr. McArthur's claims. Accordingly, the Motion must be denied in its entirety.

## II.    STATEMENT OF RELEVANT FACTS

### A. Contrary to Defendant's Assertions, Nick McArthur Cultivated a Fourteen-Year Career with RELX and a Record of Sustained High Performance.

Nick McArthur devoted fourteen years of his professional life to RELX. (Plaintiff's Separate Statement of Uncontroverted Facts and Supporting Evidence ["UNF"] 1.). He began his career with RELX in the United Kingdom and, based on consistent success, leadership ability, and institutional trust, was transferred to the United States under RELX's talent relocation program. (UNF 2). For approximately seven years, Mr. McArthur worked remotely from California in a senior executive sales role, ultimately holding the title Director of Sales. Throughout this period, he

5

received salary increases, promotions, and expanding responsibility. (UNF 3).

In 2020, Plaintiff reached 211% of his sales target and 101% of his revenue target. (UNF 4). In 2021, Plaintiff reached 120% of his sales target and 101% of his revenue target. (UNF 5). In 2022, Plaintiff reached 224% of his sales target and 115% of his revenue target. (UNF 6). In 2023, Plaintiff reached 160% of his sales target and 100% of his revenue target. (UNF 7). Finally, in 2024, prior to taking a leave of absence, Plaintiff was tracking at 116% of his revenue target. (UNF 8).

For roughly ten of his fourteen years at RELX, Mr. McArthur was named to the President's Club, a recognition reserved for the company's highest-performing sales leaders. (UNF 9). RELX's own HR and Workday records produced in discovery contain no active disciplinary actions, no unresolved warnings, and no operative performance improvement plan at the time Mr. McArthur requested CFRA leave. (UNF 10).

In late January 2024, Linda Spinner and Jim MacKillop reached out to Jimmy Hughto in Human Relations in an attempt to discipline and/or have Plaintiff removed from the new organizational group. (UNF 11). In response, Hughto advised, "I don't think an immediate termination is the right step or even possible at this time." (UNF 12). Later, Plaintiff contacted Joe Gaines to discuss management's escalation of critiques against Plaintiff. (UNF 13). Gaines reacted with visible concern, shook his head on camera, and told Plaintiff to "leave it with me." (UNF 14). Shortly thereafter, Plaintiff received notice through Workday that the proposed action was rescinded. (UNF 15). In a smoking-gun Teams message regarding the March 3 PIP, Gaines wrote:

> FYI… I put the brakes on the Nick M PIP that was supposed to be delivered tomorrow. I received a copy and it was garbage, frankly. I'm meeting with Linda and Jim tomorrow to discuss objectives and how we can drive performance. The PIP was written as a collection of stuff that he likely couldn't achieve and I didn't feel it was fair. (UNF 16).

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**B. Mr. McArthur Is Subjected to Internal Skepticism, Mockery, Mid-Protected-Leave Termination Planning, and Ultimate Retaliation for Taking Protected Leave to Care for His Dying Sister.**

On or about March 7, 2024, Plaintiff informed Linda Spinner and Joe Gaines about his sister's terminal illness and his need for leave. (UNF 17.) Joe Gaines immediately approved his request, and Plaintiff's leave began on March 10, 2024. (UNF 18).

Even before the implementation of the May 2, 2024 PIP, *while Plaintiff was actively on protected leave*, MacKillop began planning for Plaintiff's termination in an April 12, 2024 email to Joe Gaines providing a roadmap for termination. (UNF 19). In this roadmap, MacKillop writes, "Linda and I concur that if he does not provide medical certification and/or he is not approved for unpaid leave we move to terminate." (UNF 20). He continues, "If he is approved for unpaid leave under CFRA, we may need to readdress at the end of his Leave of Absence." (UNF 21).

Similarly, on March 18, 2024, Linda Spinner reached out to Employee Relations Advisor, Rodney Holton, complaining that "Nick never let Katrin know that he was going to be out for the 2 seeks he was going to be in the UK" and asking that, "[a]ssuming he will return on Monday, per his communication, can I put the PIP meeting on his calendar for Tuesday?" (UNF 22). In April, Spinner explained to Holton that she, along with others, had "discussed [the PIP] with HR on our call on Friday" and that they "all agreed that there was no need for the PIP to wait another week." (UNF 23).

During Plaintiff's leave, in an April 2024 email between Spinner and MacKillop discussing Plaintiff's leave, MacKillop writes, "Right when you thought it couldn't get more ridiculous" and that it "rubs [him] the wrong way for this to be rewarded." (UNF 24). In describing the circumstances of Plaintiff's leave in a subsequent email to Spinner, MacKillop writes, that Plaintiff's leave is "so preposterous I cannot believe its true." (UNF 25). Linda responds, stating, "[t]hat is

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

preposterous." (UNF 26). Others also convey their skepticism and mockery accusing Plaintiff of "working the system." (UNF 27).

In response to the foregoing inquiries, HR advised Linda that "If Nick took emergency medical leave, there is nothing [she] can do," that she "can not punish him or hold him to that," and suggested that she "[find] out how he is doing and let him know Tuesday [they] will meet to move forward with the plan." (UNF 28). In response, Spinner forwarded the foregoing correspondence to MacKillop, commenting, "Really???" (UNF 29.)

### C. The Unrealistic Metrics in the May 2, 2024 Performance Improvement Plan served as a Mere Pretext for Plaintiff's Eventual Termination.

Per Joe Gaines, "the purpose of the PIP… is to coach towards success and resuming things after the PIP." (UNF 30). Nonetheless, on May 1, *the day before the start of the PIP*, Jim MacKillop escalated a complaint to Jeff Hahn on the basis that he had "just caught wind of two potential incidents." (UNF 31). He admits the complaints were "hearsay" but stated that "[i]f either of these can be confirmed, can we build a case to act on them." (UNF 32). The following day, despite receiving advice to the contrary, Operations moved forward with placing Plaintiff on a PIP on May 2, 2024. (UNF 33)

Among its many requirements, the PIP demanded that Plaintiff "secure incremental revenue Minimum $100,000 closed by end of PIP." (UNF 34). The PIP also required that Plaintiff create and identify $750,000 in new salesforce opportunities, half of which at a heightened engagement stage of 3 or higher, during the period dating back to January 1, 2024 through the end of the PIP on June 3, 2024. (UNF 35). The PIP failed to account for the fact that a significant portion of deals within the life-cycle of Plaintiff's team ranged between 6-8 months. (UNF 36). Of note, the period in which Plaintiff was required to accumulate at least $750,000 in new opportunities explicitly overlapped and failed to account for the seven weeks for which Plaintiff was on protected leave. (UNF 37). Put differently, approximately one

8

third of the time allotted to Plaintiff for creation of $750,000 in new opportunity took place during Plaintiff's protected leave, a period in which RELX restricted Plaintiff's work access. (UNF 38). Moreover, creating $750,000 of opportunity at any level is unreasonable as that amounts to some people's yearly targets. (UNF 39). Nonetheless, just one week into Plaintiff's PIP period, Spinner wrote to MacKillop stating:

> I have my first check in with Nick tomorrow regarding his plan. I do want to make sure that I understand the way this will work, and want to make sure that we are all in agreement. If Nick does not meet the metrics we have put in place for the plan, by June 3, will we be able to terminate at that point? (UNF 40).

Again, Employee Relations advised that Plaintiff is a "high-risk employee" and that he would "not recommend terminating on June 3rd" but rather "move him to a Final Written Warning continuing with the areas he has not been successful with." (UNF 41). Holton also advised that if Plaintiff was "still not successful" after an additional 30 days, "then we will have a discussion about termination." (UNF 42). In a formal memo to Spinner and MacKillop, Holton "strongly advised [Spinner] to reconsider [her] plan to terminate [Plaintiff] in June." (UNF 43). He laid out the "Risks of terminating the employee in June" stating that "[t]erminating an employee who just returned from leave could expose the company to a lawsuit for wrongful termination, discrimination, or retaliation" that the "employee could claim that he was fired because of his… protected leave" and that he "was not given a fair chance to improve his performance, since he was placed on a [PIP] within two days of his return." (UNF 44).  He explained that "[i]nstead of terminating the employee in June, [she] could extend the PIP for another 30 days" in order to "give the employee a reasonable opportunity to demonstrate his improvement and show that that company is acting in good faith and following a fair process." (UNF 45). The memo advised that she "provide the employee with more feedback, coaching, training, or support to help him succeed" (UNF 46). He concluded his memo on the subject urging that Spinner "rethink [her] plan to terminate the employee in June and consider the risks

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

and alternatives." (UNF 47).

Again, Spinner pushed back against the advice of Employe Relations, sarcastically asking whether his advice was a "recommendation or a requirement?" and stating that she would "prefer not waiting another 30 days [for termination.]." (UNF 48). She even went as far as mocking his advice, retorting, "I don't know what makes [Plaintiff] more high risk than any other white male under 50. The fact that he lives in CA? That means everyone who lives in CA gets cut more slack?" (UNF 49). She further explained that it would be "6 months in June, without any performance from [Plaintiff] at all." (UNF 50).

Following the completion of the PIP, Operations held no final meetings, written evaluations, or communications indicating that Plaintiff had not successfully completed his PIP or that any adverse employment action would follow. (UNF 51). The last substantive communication Plaintiff had regarding the PIP occurred on or about May 30, 2024. (UNF 52). On July 2, 2024 Plaintiff was terminated. (UNF 53). The next day, Spinner and MacKillop celebrated Plaintiff's termination as Spinner exclaimed, "So perfect! Thank you!" to which MacKillop dryly replied, "Maybe I'll be a lawyer in my next career." (UNF 54). In

### D. Plaintiff's Failure to Repay a Duplicate Retention Bonus Was Explicitly Not a Factor in Plaintiff's Termination Decision as Testified to by Multiple Decisionmakers.

Despite repeated assertions that Plaintiff's failure to repay the Duplicate Retention Bonus served as a basis for Plaintiff's termination, Spinner, MacKillop, and Gaines all testified that the repayment, or lack thereof, was not a factor in the decision to terminate Plaintiff. (UNF 55). The repayment stems from a duplicate payment of a retention bonus that occurred in August 2021 and existed long before Plaintiff took a leave of absence in March 2024. (UNF 56). In the time between repayment issue arising and Plaintiff's leave, Plaintiff had not been terminated. (UNF 57).

/ / /

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR
IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

### E. **Plaintiff Recently Repaid the Bonus Monies Owed.**

On July 6, 2026, Plaintiff repaid the Bonus Monies owed. (UNF 58).

### III.   **LEGAL ARGUMENT**

**A. Defendant is Not Entitled to Summary Judgment on Plaintiff's CFRA Retaliation Claim as There are Ample Disputes as to Genuine Issues of Material Fact Pertaining to the Element of Causation.**

Once a plaintiff establishes a prima facie case, the *McDonnell Douglas* burden-shifting analysis applies to CFRA retaliation claims. *Soria v. Univision Radio Los Angeles, Inc.*, 5 Cal. App. 5th 570 (2016). Under this framework, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028 (2005). If the employer produces a legitimate reason, the presumption of retaliation drops, and the burden shifts back to the employee to prove intentional retaliation. *Id*,

To establish the causal link required by the fourth element, the plaintiff must show that the employer was aware that the plaintiff had engaged in the protected activity. *Morgan v. Regents of University of California*, 88 Cal. App. 4th 52 (2000). A retaliatory motive and causal link may be established through inferences derived from circumstantial evidence, such as the employer's knowledge of the protected activity followed by an adverse employment action within a relatively short time thereafter. *Id*. Of note, Plaintiff's *prima facie* burden at trial is not the same as his burden in opposing a motion for summary judgment. Here, Plaintiff need only establish that a genuine issue *as to any material fact* does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

Defendant's entire basis for the present motion rests on their assertion that there was a history of pre-leave conduct that justified Plaintiff's termination. Defendant's Motion for Summary Judgment ("MSJ") at 12:6-8. While there were efforts to discipline and remove Plaintiff from his new organizational group before his leave of

11

absence, RELX's own document production contains no active disciplinary actions, unresolved warning or operative performance improvement plans at the time that Plaintiff requested CFRA leave. UNF 10. Likewise, all attempts to remove or discipline Plaintiff following his joining of the new organizational group in 2024 were ultimately rejected by either Joe Gaines, HR, or Employee Relations. UNF 12, 14, 15. Though the PIP was prepared before Plaintiff took a leave of absence, said PIP was rejected, rescinded, and denied by Joe Gaines on the technical ground that it was "garbage" and constructed in such a way that it was deemed unfair and unachievable. UNF 16. As such it was quickly rescinded. Thus, to reiterate, there were no disciplinary actions or performance plans in place prior to Plaintiff's request for leave.

There is ample evidence to support Plaintiff's claim for retaliation let alone defeat defendant's motion. Following Plaintiff's request for leave, both Jim MacKillop and Linda Spinner began actively investigating the circumstances of Plaintiff's leave and campaigning for his prompt termination. in April 2024, while Plaintiff was still on leave, Jim MacKillop laid out a roadmap for Plaintiff's termination and argued that if, for some reason, Plaintiff failed to provide medical certification that his sister was dying overseas, then he should be "immediately terminated." UNF 20. He doubles down, explaining that even if Plaintiff's leave were approved, they would "address" him at the end of the leave. UNF 21. Similarly, just a week following the start of Plaintiff's leave, Linda Spinner complained that McArthur had not informed a fellow team member of his leave and sought authority to place Plaintiff on a PIP the day after his return to work. Again, one week into Plaintiff's leave of absence to care for his dying sister, Linda Spinner was already trying to place McArthur on a performance plan, which served as the next step toward Plaintiff's inevitable termination. UNF 22.

In correspondence with Plaintiff, Plaintiff's supervisors feigned support, but, behind the scenes, they mocked and ridiculed the need for his leave. MacKillop called Plaintiff's leave "ridiculous" and volunteered to Spinner that it "rubs [him] the wrong

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

way." UNF 24. MacKillop continued his ridicule behind the scenes, writing that Plaintiff's leave was "so preposterous I cannot believe its true." UNF 25. Spinner parroted Jim's sentiments as she too called his leave preposterous. UNF 26. The ridicule was not just limited to Plaintiff's immediate supervisors. RELX administrators suggested to Spinner and MacKillop that Plaintiff was "working the system." The foregoing sentiments are indicative of Defendant's distaste for Plaintiff's leave and their intent to rid themselves of Plaintiff accordingly.

Plaintiff's supervisors were dead-set on demonizing Plaintiff and placing him on a fast track toward unemployment. Along they way, they blew past the repeated warnings of HR and Employee Relations. When told that she could not "punish" Plaintiff for taking a protected leave, Spinner scoffed at the advice and mockingly forwarded the email to MacKillop, saying nothing but, "Really???" UNF 29. Just a few days following Plaintiff's return from leave, Jim MacKillop goes over Jimmy Hughto's head and reaches out to Jeff Hahn, a more senior HR representative with RELX. The singular purpose of his communication with Hahn was to "build a case" against Plaintiff based solely on issues MacKillop, himself, admitted were unsubstantiated and "hearsay." UNF 30. Again, this communication took place on May 1, 2024, the day before RELX placed Plaintiff on a PIP. Defendants cannot claim that the PIP was intended as a tool to coach and provide opportunities to improve when they were actively trying to "build a case" to fire Plaintiff the day before the PIP went into action. Joe Gaines may claim that the PIP was authentically designed to encourage performance, but the this is directly contradicted by the immediate and consistent push to terminate Plaintiff during in the middle of his leave of absence, upon his return from his leave of absence, and within days of the implementation of the PIP, itself.

Despite the repeated advice to proceed cautiously, Defendants proceeded with placing Plaintiff on a PIP within days of returning from leave. The eventual PIP, which was a reiteration of the previous "garbage" and "unfair" PIP that Joe Gaines

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

denied, remained largely unfair. For example, Plaintiff was required to close $100,000 in new revenue by the end of the PIP period. The PIP failed to account for the fact that a significant portion of deals within the life-cycle of Plaintiff's team ranged between 6-8 months and providing only 30 days was unrealistic and insincere. UNF 33. Other metrics requiring that Plaintiff identify $750,000 in new salesforce opportunities during the period of January 1, 2024, through the end of the PIP period on June 3 2024, also failed to account for the 7 weeks in which Plaintiff was on protected leave thereby shortchanging his window of fulfillment by roughly one third. UNF 34, 35. This is a lofty goal considering that this figure nearly amounts to some people's yearly target. Based on the foregoing, there is sufficient evidence to establish that the May 2, 2024 PIP was a mere pretext and box to check on the road to Plaintiff's termination.

Like clockwork, even before Plaintiff had a chance to satisfy the PIP, Linda Spinner began requesting authority to proceed with termination immediately following completion of the PIP period. Again, Plaintiff's supervisor was warned against taking adverse employment action. Spinner was provided with multiple alternatives and opportunities to coach, support, and train Plaintiff rather than move to immediate termination. Nonetheless, Spinner scoffed at the advice and demanded to know whether it was a recommendation or a requirement. UNF 43. Defendant did not immediately move to terminate Plaintiff after the PIP. Rather, as a means to mitigate legal risk and manage the appearance of retaliation, RELX waited 30 days to terminate Plaintiff. In that time, RELX held no final meetings, written evaluations, or communications indicating that Plaintiff had not successfully completed his PIP or that any adverse employment action would follow. As such, on July 2, 2024, Plaintiff was blindsided by his prompt termination.

Defendants claim that Plaintiff's failure to repay a duplicate retention bonus played a role in and justified Plaintiff's termination. Deposition testimony from Linda Spinner, Jim MacKillop, and Joe Gaines and reflect that the repayment issue was not

14

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

a factor in termination. If it were a factor, Defendants could have taken action at any time since August 2021, but it did not. Accordingly, this argument holds no merit.

### B. Defendant is Not Entitled to Summary Judgment on Plaintiff's Wrongful Termination Claim for the Same Reasons as Above

Defendant's only argument as to why Plaintiff's claim for wrongful termination in violation of public must fail is because it is derivative of the foregoing retaliation claim. For

### IV.   CONCLUSION

Given the above, genuine issues of material fact exist as to each of the claims at issue in this Motion, and Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety. However, as outlined above, there are genuine disputes of material fact as to each of the material elements of Plaintiff's retaliation claim, and Defendant fails to establish that it is entitled to summary judgment on that claim. As such, Defendant has failed to meet its summary judgment burden as to Mr. McArthur's wrongful termination claim.

DATED: July 7, 2025                     **RANEN KHADEMI PC**

By: _____
JEFFREY S. RANEN
PARISA KHADEMI
MARGARET R. WRIGHT
Attorneys for Plaintiff NICHOLAS
MCARTHUR

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**